UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES PERCY PARNISKE, et al.,

     Plaintiffs,        Civil Action No. 15-CV-12040
vs.              HON. MARK A. GOLDSMITH

MICHIGAN BELL TELEPHONE
COMPANY, d/b/a AT&T,

     Defendant.
_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Dkt. 59)

This matter is before the Court on Defendant Michigan Bell Telephone Company's motion for summary judgment (Dkt. 59). Plaintiffs are 12 former employees of Michigan Bell who were each tasked with telephonically assisting dissatisfied customers seeking to disconnect services. Plaintiffs claim that they were either constructively discharged or terminated by Michigan Bell in retaliation for taking leave under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, et seq., and because of a disability, in violation of Michigan's Persons With Disabilities Civil Rights Act ("PWDCRA"), Mich. Comp. Laws § 37.1101, et seq. Michigan Bell contends that it is entitled to summary judgment because none of the Plaintiffs can establish all of the requisite elements for either claim. For the reasons stated below, the Court grants in part and denies in part Michigan Bell's motion.

## I. BACKGROUND

Each Plaintiff was employed by Michigan Bell as either a service representative or consumer product specialist in Michigan Bell's Port Huron call center. First. Am. Compl. ¶ 22 (Dkt. 12). The Port Huron call center was known as a retention center, meaning that its primary

1

goal was to retain customers who had expressed a desire to disconnect services with Michigan Bell. Parniske Dep. Tr. at 42, Ex. 1 to Def. Mot. (Dkt. 59-2). Service representatives and consumer product specialists also dealt with customer complaints and attempted to sell certain services to dissatisfied customers. Id. at 51.

The Port Huron call center had the following chain of command: service representatives and consumer product specialists reported to a first-level coach manager, the coach manager reported to a center sales manager, and the center sales manager reported to a general manager. Armstrong Dep. Tr. at 41, Ex. 2 to Def. Mot. (Dkt. 59-3). The service representatives and consumer product specialists were evaluated based on monthly scorecard results. Parniske Dep. Tr. at 52. These scorecards measured the employee's ability to both retain dissatisfied customers and sell new products to those customers. Id. at 51.

At various points throughout their employment with Michigan Bell, Plaintiffs took leave under the FMLA or took short term disability leave. Linda Armstrong took FMLA leave at various points during her employment for ailments including upper respiratory infections, heart issues, and an ankle injury. Armstrong Dep. Tr. at 92-124. James Parniske took leave multiple times during his employment for a lower back injury, gastrointestinal issues, a wrist injury, and to care for his daughter after she underwent surgery. Parniske Dep. Tr. at 105-115. Kathleen Johns suffered from a chronic sinus condition that forced her to take leave at various points during her employment with Michigan Bell. Johns Dep. Tr. at 123-139, Ex. 3 to Def. Mot. (Dkt. 59-4). Cathy Lynn Nofs sought leave intermittently for anxiety and depression. Nofs Dep. Tr. at 123, Ex. 4 to Def. Mot. (Dkt. 59-5). Kimberly Leslie took leave at various points for ailments including asthma, allergies, and gastrointestinal issues. Leslie Dep. Tr. at 108-115, Ex. 5 to Def. Mot. (Dkt. 59-5). Leslie also took leave to undergo surgery to remove a tumor from her neck.

2

Id. at 122.  Lori Shea took leave multiple times during her employment to deal with depression and anxiety.  Shea Dep. Tr. at 99-100, Ex. 6 to Def. Mot.  (Dkt. 59-6).  Kristie Pretty-Kendall took leave to address a neck issue as well as anxiety and depression.  Pretty-Kendall Dep. Tr. at 129-130, 143, Ex. 7 to Def. Mot. (Dkt. 59-8).  Tracy Easton took leave because of a sinus infection and asthma, as well as for mental health treatment during her employment with Michigan Bell.  Easton Dep. Tr. at 67-83, Ex. 8 to Def. Mot. (Dkt. 59-9).  Ronald Emerick took leave after the birth of his daughters, as well as for issues relating to stress.  Emerick Dep. Tr. at 84-88, Ex. 9 to Def. Mot. (Dkt. 59-10).  Kelly Jefferson took leave due to issues with asthma. Jefferson Dep. Tr. at 85, Ex. 10 to Def. Mot. (Dkt. 59-11).  Sara Osgood took leave to deal with migraines.  Osgood Dep. Tr. at 116, Ex. 11 to Def. Mot. (Dkt. 59-12).  Heidi Pojeky took leave primarily to deal with depression.  Pojeky Dep. Tr. at 85-95, Ex. 12 to Def. Mot.  (Dkt. 59-13).

Armstrong, Parniske, Johns, Nofs, Leslie, and Shea all resigned from their employment with Michigan Bell and are now claiming they were constructively discharged for taking leave under the FMLA and because they had a disability.  Although Pretty-Kendall, Easton, Jefferson, and Osgood were technically terminated by Michigan Bell, they now argue that they had effectively resigned prior to their terminations and thus were constructively discharged for using FMLA leave and because they had disabilities.[1]  Emerick and Pojeky claim that they were terminated in retaliation for taking leave under the FMLA and because of their disabilities.

Several of Michigan Bell's former management-level employees testified that a policy was instituted by general manager Jason Leiker, and continued by his successor Geoffrey Lee, to target FMLA and short-term disability leave users at the Port Huron center.  Sean Brister, a former center sales manager at the center, testified that between 2009 and 2013, Lee told her and

---

[1]  As will be discussed infra, the failure of Pretty-Kendall, Easton, Jefferson, and Osgood to actually resign is fatal to their constructive discharge claims.

others during management meetings to target FMLA users.  Brister Dep. Tr. at 179, Ex. 9 to Pl. Resp. (Dkt 60-10).  Brister stated that Lee asked her and the other managers the following: "if you are on an island and you needed to, you know, save someone, who would you save?"  Id. Brister explained "that directive was not to save the people on FMLA or disability that were bringing the center down."  Id.  Brister testified that Lee ordered her and other management employees to target FMLA and disability leave users for removal from the company, regardless of the quantity of leave used.  Id. at 181.

Elizabeth Jeup, a coach manager, testified that management meetings would take place quarterly, and that a primary talking point was the targeting of FMLA and disability leave users. Jeup Dep. Tr. at 9-10, Ex. 13 to Pls. Resp. (Dkt. 60-14).  Jeup noted that Leiker and Lee were motivated to target FMLA users because management was expected to meet certain metrics regardless of how many representatives were at work, whereas representatives had their scorecards adjusted to reflect days they were out on FMLA leave.  Id. at 18.

In reference to employees who took leave, Lee told Jeup and the other managers to "work them out of the business" by scrutinizing their phone calls in order to find errors, such as failing to properly state legal disclaimers to customers and failing to keep phone lines open for the proper amount of time.  Id. at 12.  Coaches were also instructed to scrutinize the amount of time FMLA and disability leave users were taking for lunch and breaks.  Id.

Kelli Ashford-Porter, a center sales manager, also testified that Lee gave a directive to target FMLA users.  Ashford-Porter Dep. Tr. at 23-24, Ex. 12 to Pl. Resp. (Dkt. 60-13).  Joseph Gouin testified that Lee, center sales manager Pearlanne Pollard, and assistant manager Frank Mayberry would consistently give directives at the quarterly meetings to target FMLA users. Gouin Dep. Tr. at 16, Ex. 21 to Pl. Resp. (Dkt. 60-22).  Gouin stated that he was told by Lee that

it was either "them or us," which Gouin understood to mean that, if management did not target users of FMLA or disability leave, the entire call center would be shut down.  Id.  Parniske testified that there was a board placed in the call center that counted how many people were absent each day.  Parniske Dep. Tr. at 157.  Several other coach managers testified that they were given a directive by upper-level management to target users of FMLA or disability leave.  See Reynolds Dep. Tr. at 188-189, Ex. 14 to Pls. Resp. (Dkt. 60-15); Bawol Dep. Tr. at 185, Ex. 15 to Pls. Resp. (Dkt. 60-16); Howard Dep. Tr. at 82, Ex. 11 to Pls. Resp. (Dkt. 60-12).

Jeup testified that specific names were brought up consistently in management meetings. Jeup testified that Johns, Osgood, Jefferson, Parniske, Pretty-Kendall, Shea, and Nofs were individuals who were referenced in meetings for using FMLA or disability leave.  Jeup Dep. Tr. at 23-24.   Jeup stated that she remembered Johns, Parniske, and Nofs were mentioned specifically as individuals who were to be targeted for FMLA use.  Id. at 23-25.  Tracy Turner, a coach manager, also testified that Johns, Osgood, and Jefferson were brought up specifically as individuals to be targeted for FMLA use.  Turner Dep. Tr. at 46-48, Ex. 19 to Pl. Resp. (Dkt. 60-20).[2]  In an email dated January 20, 2011, Turner questioned whether Osgood and two others should have been named the winners of a contest for the most retained customers of the day because "[t]hese 3 winner's [sic] all abuse FMLA."  1/20/2011 Email at 2 (cm/ecf page), Exhibit 20 to Pl. Resp. (cm/ecf page) (Dkt. 60-21).  Turner testified that she sent this email because of the directive that Lee had given her to target FMLA users.  Turner Dep. Tr. at 29-30.  Additional facts regarding each individual Plaintiff will be addressed in the analysis section below.

## II.  STANDARD OF REVIEW

---

[2]  In the record, Turner is occasionally referred to as Tracy Domozik.  For the sake of consistency, she will be referred to as Turner.

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "In making this determination, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor."  U.S. S.E.C. v. Sierra Brokerage Servs., Inc., 712 F.3d 321, 327 (6th Cir. 2013).  The court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-252 (1986).  In considering the material facts in the record, the court must recognize that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  Id. at 422.  Furthermore, plaintiff "cannot rely on conjecture or conclusory accusations."  Arendale v. City of Memphis, 519 F.3d 587, 605 (6th Cir. 2008).

### III. ANALYSIS

#### A. FMLA Retaliation

The FMLA states that an employer may not "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the FMLA]." 29 U.S.C. § 2615(a)(2); 29 C.F.R § 825.220.  The Court's analysis of Plaintiffs' FMLA retaliation claims depends on the type of proof each Plaintiff presents to the Court.  An employee can prove an FMLA retaliation claim using direct evidence of retaliation or circumstantial evidence that supports an inference of retaliation.  Imwalle v. Reliance Med. Prods., Inc., 515 F.3d 531, 538 (6th Cir. 2008).  Unlike circumstantial evidence, "direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the

6

protected group. The evidence must establish not only that the plaintiff's employer was predisposed to discriminate on the basis of [the FMLA], but also that the employer acted on that predisposition." Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 707 (6th Cir. 2008). "[A]n employee who has presented direct evidence of improper motive does not bear the burden of disproving other possible nonretaliatory reasons for the adverse action. Rather, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive." Weigel v. Baptist Hosp. of E. Tennessee, 302 F.3d 367, 382 (6th Cir. 2002).

In the absence of direct evidence, FMLA retaliation claims premised on circumstantial evidence are analyzed under the familiar three-part, burden-shifting test set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Bryson v. Regis Corp., 498 F.3d 561, 570 (6th Cir. 2007). Under this test, the plaintiff must first demonstrate a prima facie case of FMLA retaliation by establishing the following four factors: (i) the plaintiff engaged in conduct protected by the act, (ii) the defendant was aware that the plaintiff exercised protected rights, (iii) the defendant took an adverse employment action against the plaintiff, and (iv) there was a causal connection between the protected conduct and the adverse employment action. Saroli v. Automation & Modular Components, Inc., 405 F.3d 446, 451 (6th Cir. 2005).

If the plaintiff is able to make out a prima facie case of FMLA retaliation, "the burden shifts to the employer to proffer a legitimate, nondiscriminatory rationale" for the adverse action. Edgar v. JAC Prods., Inc., 443 F.3d 501, 508 (6th Cir. 2006). If the employer can meet this burden, the burden shifts back to the plaintiff to prove that "the alleged nondiscriminatory rationale was in reality a pretext designed to mask discrimination." Skrjanc v. Great Lakes Power Serv. Co., 272 F.3d 309, 315 (6th Cir. 2001). The plaintiff can prove pretext by

demonstrating that "the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." Dews v. A.B. Dick Co., 231 F.3d 1016, 1021 (6th Cir. 2000).

Several Plaintiffs have asserted that Michigan Bell's conduct amounted to constructive discharge. For purposes of FMLA retaliation analysis, constructive discharge constitutes an adverse employment action. Saroli, 405 F.3d at 451. To establish a constructive discharge, the plaintiff must present evidence that (i) his employer "deliberately created intolerable working conditions, as perceived by a reasonable person" and (ii) his employer created the conditions with the intent of forcing the employee to quit. Id. In determining whether the first prong has been met, courts should consider the following factors "singly or in combination":

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

Id.

In regard to the second prong, "[i]ntent can be shown by demonstrating that quitting was a foreseeable consequence of the employer's actions." Festerman v. Cnty. of Wayne, 611 F. App'x 310, 321-322 (6th Cir. 2015).[3]

---

[3] The Plaintiffs arguing constructive discharge contend that they have met their burden because Michigan Bell's retaliatory actions have rendered them unable to work anywhere. Pl. Resp. at 105-107. Plaintiffs cite to Haysman v. Food Lion, Inc., 893 F. Supp. 1092 (S.D. Ga. 1995), for the proposition that harassment making any future employment impossible can constitute constructive discharge. Unlike in Haysman, none of the Plaintiffs here has previously alleged that harassment has rendered him or her unable to work at all. While the plaintiff in Haysman was forced to work extra hours against his doctor's orders, all of the Plaintiffs here were granted leave when proper medical certification was provided. This case is also distinguishable from Smith v. Henderson, 376 F.3d 529 (6th Cir. 2004). In Smith, the defendant denied the plaintiff a reasonable accommodation, thus forcing the plaintiff to work in excess of her medical

**B.  PWDCRA Claim**

Plaintiffs also claim that they were constructively discharged or terminated because of their disabilities in violation of the PWDCRA.  "In order to prove a violation of the PWDCRA, a plaintiff must show that: (1) he is disabled as defined in the act, (2) his disability is unrelated to his ability to perform the job duties, and (3) he has been discriminated against as defined in the statute."  MacDonald v. United Parcel Serv., 430 F. App'x 453, 460-461 (6th Cir. 2011).  As with their FMLA claims, the analysis of Plaintiffs' PWDCRA claims depends on the type of proof presented to the Court.  While multiple Plaintiffs have presented direct evidence that they were targeted for their use of FMLA leave, none of them has presented direct evidence of constructive discharge or termination because of a disability.  All of the comments attributed to Leiker and Lee concerned pushing out employees who used FMLA; none of these discussions involved removing employees due to any particular disability.  See Schindewolf v. City of Brighton, No. 14-12161, 2015 WL 3451150, at *4 (E.D. Mich. May 29, 2015) ("Simply applying for and using FMLA does not equate to a finding of or knowledge of disability.").

If a plaintiff cannot show direct evidence of disability discrimination, the plaintiff must first establish a prima facie case of discrimination by showing that (i) he is disabled; (ii) he is otherwise qualified for the position, with or without reasonable accommodation (iii) he has suffered an adverse employment action; (iv) the employer knew or had reason to know of the plaintiff's disability; and (v) the position remained open while the employer sought other applicants or the disabled individual was replaced.  Ferrari v. Ford Motor Co., 826 F.3d 885,

---

restrictions, id. at 537, a circumstance not present here.  None of the Plaintiffs here has alleged that the harassment at Michigan Bell was so severe that it made any future work impossible. Plaintiffs may still establish constructive discharge by providing evidence of one or more of the seven factors indicative of intolerable working conditions as set forth in Saroli, as well as evidence that these conditions were imposed with the intention of forcing Plaintiffs to quit. Plaintiffs' efforts to establish constructive discharge under that analysis are considered infra.

891-892 (6th Cir. 2016).  The fifth factor may be satisfied "by showing that similarly situated non-protected employees were treated more favorably."  Jones v. Potter, 488 F.3d 397, 404 (6th Cir. 2007).

If the plaintiff establishes a prima face case of disability discrimination under the PWDCRA, the defendant must articulate a legitimate, nondiscriminatory reason for the termination.  Till v. Spectrum Juvenile Justice Servs., 805 F. Supp. 2d 354, 362 (E.D. Mich. 2011).  If the defendant can articulate such a reason, the burden shifts back to the plaintiff to prove that the proffered reason is pretextual.  Id. at 362-363.  As with an FMLA claim, a plaintiff can establish pretext by showing: (i) that the proffered reasons had no basis in fact, (ii) that the proffered reasons did not actually motivate the employer's action, or (iii) that they were insufficient to motivate the employer's action.  Ferrari, 825 F.3d at 895.

The PWDCRA defines a disability as follows:

> (i) A determinable physical or mental characteristic of an individual which may result from disease, injury, congenital conditions of birth, or functional disorder, if the characteristic: (A) . . . substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's ability to perform the duties of a particular job or position or substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's qualifications for employment or promotion.

Donahoo v. Master Data Ctr., 282 F. Supp. 2d 540, 548 (E.D. Mich. 2003) (quoting Mich. Comp. Laws § 37.1103(d)(i)).  An individual is also considered to be disabled under the statute if she is "regarded as having a determinable physical or mental characteristic described in subparagraph (i)."  Mich. Comp. Laws § 37.1103(d)(iii).  A "major life activity" is defined as a "function[ ] such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working."  Chiles v. Machine Shop, Inc., 606 N.W.2d 398, 407 (Mich. Ct. App. 1999).

"[I]t is not enough for an impairment to affect a major life activity, but rather the plaintiff must proffer evidence from which a reasonable inference can be drawn that such activity is substantially limited." Id. at 408. "To determine whether an individual is substantially limited, a court considers (i) the nature and severity of the impairment, (ii) the duration or expected duration of the impairment, and (iii) the permanent or expected permanent or long-term effect. Thus, a disability normally does not include temporary medical conditions, even if those conditions require extended leaves from work." Donahoo, 282 F. Supp. 2d at 550. The PWDCRA states that discharge is a form of discrimination under the statute. Mich. Comp. Laws § 37.1202(b). "Michigan law recognizes constructive discharge as an adverse employment action." Agnew v. BASF Corp., 286 F.3d 307, 309 (6th Cir. 2002).

### C.  Analysis of Each Plaintiff's Claims

Plaintiffs argue that all of their claims should be analyzed together, taking into account the "totality of the circumstances." Pl. Resp. at 100. In support of this argument, Plaintiffs cite Jackson v. Quanex Corp., 191 F.3d 647 (6th Cir. 1999). Jackson is inapposite. In that case, the Sixth Circuit held that courts should take into account the totality of the circumstances when determining whether a plaintiff was subject to a hostile work environment. Id. at 658-659. The court held that all discriminatory comments, even those to other individuals in the office, should be taken into account in analyzing the plaintiff's claim. Id. at 659-660. However,  this case does not involve a claim of a hostile work environment. Each Plaintiff is alleging that he or she was either constructively discharged or terminated in retaliation for using FMLA leave and for having a disability. As a court in this circuit recently recognized, "claims of discrimination and retaliation . . . are different in kind from a hostile work environment claim." Shoup v. McDonald, No. 3:14-CV-248, 2016 WL 3387309, at *5 (S.D. Ohio June 15, 2016); see also

11

Moore v. KUKA Welding Sys. & Robot Corp., 171 F.3d 1073, 1080 (6th Cir. 1999) ("The plaintiff must show more than a Title VII violation to prove constructive discharge, so the fact that plaintiff may have proven a hostile work environment is not enough by itself to prove constructive discharge also.").[4]   Furthermore, Jackson only involved one plaintiff seeking to introduce the totality of the circumstances in her work environment, not several plaintiffs seeking to have their retaliation claims analyzed together.

Accordingly, each Plaintiff's claim will be analyzed individually below.

### D. Constructive Discharge Plaintiffs

#### 1. Linda Armstrong

##### a. FMLA Claim

Armstrong has not presented direct evidence that she was targeted because of her FMLA use.  "Direct evidence 'is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.  It does not require the fact finder to draw any inferences to reach that conclusion.'"   Bhama v. Mercy Mem'l Hosp. Corp., 416 F. App'x 542, 552 (6th Cir. 2011) (quoting Amini v. Oberlin Coll., 440 F.3d 350, 359 (6th Cir.2006)).  While Armstrong presents various pieces of circumstantial evidence, she does not offer direct evidence of a decision-maker targeting her specifically for her use of FMLA leave.  As a result, her claims are subject to analysis under the McDonnell Douglas framework.

Armstrong took leave under the FMLA for various health issues beginning in 2002 and continuing through March 2012.  Armstrong Dep. Tr. at 93-104.  Armstrong testified that her supervisors were aware of her medical conditions.  Id. at 174.  It must then be determined whether Armstrong suffered an adverse employment action.  Armstrong retired from her

---

[4] Plaintiffs cite Moore for the proposition that a constructive discharge claim can be predicated solely on a hostile work environment.  As noted above, the court actually held the opposite.

employment in January 2013, but now claims that she was constructively discharged.  Id. at 140.

As noted above, an employee is constructively discharged if her employer subjects her to

intolerable working conditions with the intention of forcing the employee to quit.  Saroli, 405

F.3d at 451.  Armstrong is not claiming that she was demoted, had her salary or job

responsibilities reduced, or that she was reassigned to menial or degrading work or to work under

a supervisor.

However, Armstrong does provide evidence that she was often badgered and harassed by

her first-level coach manager, Carol Crawford, while on phone calls with customers during the

last year of her employment.  Armstrong testified that Crawford would stand over her desk while

she was on the phone with customers and interrupt her while she was on the phone.  Armstrong

Dep. Tr. at 64.  In addition to these interruptions, Crawford told Armstrong on multiple

occasions that "maybe this isn't the job for you if it's too stressful, or you can't handle, and, you

know, with your health issues, maybe you should think about retiring or leaving the company or

looking for another job."  Id. at 107-108.  This demonstrates that, contrary to Michigan Bell's

claims, Crawford's comments were not simply feedback regarding job performance.  Armstrong

also testified that, with the exception of her last year of employment, her calls were only

monitored once a month.  Id. at 65.  Within the last year of her employment, Armstrong was

subject to monitored calls on a more frequent basis.  Id.

Armstrong points to evidence supporting the inference that her treatment by Crawford

was the result of a policy to target FMLA leave users.  In a company-wide meeting that took

place in 2008 or 2009, Leiker told the employees that they needed to come to work.  Id. at 130,

229.  When asked a question regarding the company's new scorecard system for evaluating

employees, Leiker responded, "as long as you're coming to work, you don't have anything to

13

worry about." Id. at 229. When asked specifically about FMLA leave, Leiker responded, "you don't have anything to worry about if you come to work." Id. at 230. Another meeting regarding attendance took place in 2012 and was led by Lee and Brister. During the meeting, Lee and Brister stated that the "office numbers were low and if people weren't there, we weren't going to make our numbers and our office could end up being closed." Id. at 130. This meeting coincides with the time period in which Armstrong was scrutinized heavily by Crawford.

There is also evidence that Crawford made an offer of early retirement to Armstrong. When asked when she decided to retire from the company, Armstrong stated "[w]hen I signed these papers. [Crawford] wrote the papers up without me asking her to . . . . I said Carol, I don't even know if I'm ready to do that because I wasn't because I was going back and forth on that." Id. at 149-150. In response, Crawford told Armstrong that the retirement papers were ready to be signed and that they were only effective for a certain amount of time. Id. at 150. While Armstrong testified that Crawford did not force her to sign the papers, she testified that after thinking about it for a few minutes, she decided that she could not deal with the stress of the position any longer. Id. at 151.

Michigan Bell cites Adams v. Lucent Techs., Inc., 284 F. App'x 296, 302 (6th. Cir. 2008), for the proposition that an offer of early retirement will only constitute a constructive discharge if the employee has "no definite prospect of continued employment with the company." However, Adams involved a retirement where the plaintiff's company was merging with another and layoffs were expected. While termination was not imminent for Armstrong, multiple witnesses testified that Lee and others in management made it clear that it was a top priority to move FMLA users, like Armstrong, out of the business. This directive certainly made

Armstrong's prospects of continued employment bleak. In any event, this offer of early retirement does not stand alone, as it was made after months of badgering by Crawford.

Finally, Lee's directive is evidence that Crawford's treatment of Armstrong was done with the intention of forcing her to quit. Lee specifically ordered management to move FMLA leave users out of the business because their inability to perform was putting the call center in jeopardy. Gouin Dep. Tr. at 16. Crawford's scrutiny, her comments about Armstrong's health, and her offer of early retirement demonstrate that Armstrong's retirement "was a foreseeable consequence of the employer's actions." Festerman, 611 F. App'x At 322. The comments by Lee and Leiker regarding employees using sick leave, combined with Crawford's comments regarding Armstrong's health, demonstrates the final factor, i.e., Armstrong was constructively discharged because of her FMLA leave use. Because Michigan Bell does not offer a nondiscriminatory rationale for its adverse employment action, Armstrong's FMLA claim survives.

### b. PWDCRA Claim

Because Armstrong does not present direct evidence of discrimination, she must first demonstrate the following: she was disabled, she was otherwise qualified for her position, she has suffered an adverse employment action, Michigan Bell knew of her disability, and her position remained open while Michigan Bell sought other applicants or she was replaced. Ferrari, 826 F.3d at 891. An individual is actually disabled if she has a physical or mental characteristic that "substantially limits 1 or more of the major life activities of that individual," and is unrelated to the individual's ability to perform her job or to her qualifications for the job. Donahoo, 282 F. Supp. 2d at 548. "[A]n impairment cannot be 'substantial' if it is of a merely temporary nature." Id. at 550. Armstrong testified that she took leave to deal with various

15

temporary health issues, including respiratory and ear infections and an ankle injury.  Armstrong Dep. Tr. at 92.  None of these is a permanent condition as contemplated by the statute.

Because she cannot demonstrate an actual disability, Armstrong must show that she was perceived as having a disability.  Armstrong must show: (i) she was regarded as having a determinable physical or mental characteristic, (ii) this perceived characteristic was regarded as substantially limiting at least one of her major life activities, and (iii) the perceived characteristic was regarded as being unrelated to her ability to perform her job or her qualifications for the job. Schmidli v. City of Fraser, 784 F. Supp. 2d 794, 805 (E.D. Mich. 2011).  Crawford arguably indicated her perception that Armstrong was disabled when she stated that "maybe this isn't the job for you if it's too stressful, or you can't handle, and, you know, with your health issues." Armstrong Dep. Tr. at 107-108.  However, this statement also indicates Crawford's belief that any disability was directly related to Armstrong's ability to perform her job, thus defeating her claim of having a perceived disability within the context of the PWDCRA.  Notably, Armstrong testified to her belief that she is not disabled.  Id. at 134.

As a result, Armstrong's PWDCRA claim fails.

### 2.  James Parniske

#### a.  FMLA Claim

There is direct evidence in the record that Parniske was retaliated against for taking FMLA leave.  "Discriminatory remarks by decision makers and those who significantly influence the decision-making process can constitute direct evidence of discrimination."   Sharp v. Aker Plant Servs. Grp., Inc., 726 F.3d 789, 798 (6th Cir. 2013).  "A statement is not direct evidence of discrimination if it can only lead to a conclusion of discrimination after numerous inferences and

assumptions are made." DeMasellis v. St Mary's of Michigan, 506 F. App'x 435, 436 (6th Cir. 2012).

Jeup testified that she specifically remembered Parniske's name being brought up in meetings amongst management as someone who was to be moved out of the business. Jeup Dep. Tr. at 24. In regard to Parniske, Plaintiffs' counsel asked Jeup, "and his was one of the names that was brought up as an individual to be targeted because of FMLA or disability use?" Id. In response, Jeup testified, "he was one we needed to work out." Id. These meetings were led first by Leiker and then Lee, two general managers of the Port Huron center. Id. at 22. As general managers, they had significant influence over the decision-making process of the coach managers, their subordinates. Sharp, 726 F.3d at 798. Because there is evidence that Parniske was brought up specifically by Leiker and Lee as an individual to be targeted, he "does not bear the burden of disproving other possible nonretaliatory reasons for the adverse action. Rather, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive." Weigel, 302 F.3d at 382.

However, prior to any burden-shifting, the Court must determine if there was actually an adverse action taken against Parniske. Regardless of whether the FMLA claim involves direct or indirect evidence of retaliation, the burden is still on the plaintiff to prove that he suffered an adverse employment action. Like Armstrong, Parniske is claiming that he was constructively discharged. As noted above, to establish that he was constructively discharged, Parniske must prove that he was subject to intolerable working conditions with the intent to compel him to resign. Saroli, 405 F.3d at 451. In regard to intolerable working conditions, there is no evidence that Parniske was demoted, had his salary or job responsibilities reduced or was reassigned to degrading work or to work under a supervisor. However, there is evidence in the record that

17

Parniske was pressured to leave the company because of his FMLA leave use.  Parniske testified that two of his coach managers, Connie Hayes and Jessica Curtiss, would interrupt him during calls every 30 minutes to inquire about his revenue, even during months in which his revenue was high.  Id. at 69.  Parniske testified that Curtiss would frequently stand behind him during calls and listen in on his calls without giving him any feedback.  Id. at 71.  Parniske stated that, based on his conversations with other representatives supervised by Hayes and Curtiss, this treatment was unique to him.  Id.

Michigan Bell is correct that the manner in which an employee is supervised is not grounds for a claim of constructive discharge.  Smith v. Henderson, 376 F.3d 529, 534 (6th Cir. 2004).  However, this supervision was coupled with comments directed at Parniske's use of FMLA and disability leave.  Hayes would make comments to Parniske regarding his FMLA use, such as thanking him for coming into work in front of his coworkers after he had been off of work on FMLA leave.  Parniske Dep. Tr. at 161.  When Parniske would leave work the day after taking FMLA leave, Hayes would ask Parniske, "you're coming to work tomorrow, right?"  Id. There is also evidence that other coaches, including Lynda Howard, made comments regarding Parniske's FMLA use.  Id. at 163.  As Parniske put it, "FMLA was always discussed.  It was always in the air."  Id. at 156.

In regard to the intent element, "[i]ntent can be shown by demonstrating that quitting was a foreseeable consequence of the employer's actions."  Festerman, 611 F. App'x at 321-322. Jeup stated that Parniske was "one we needed to work out."  Jeup Dep. Tr. at 24.  The actions taken by Hayes and others all were seemingly taken to that end.  Parniske's resignation was a foreseeable consequence of the extra scrutiny he received from Hayes and Curtiss, as well as the prodding to quit by Hayes.  Parniske can demonstrate that he was constructively discharged.

The burden then shifts to Michigan Bell to "prove by preponderance of the evidence that it would have made the same decision absent the impermissible motive." Weigel, 302 F.3d at 382. Michigan Bell has presented evidence that Parniske was absent from September 6, 2012 to November 22, 2012, but never provided Michigan Bell with the medical certification necessary to receive approval for FMLA leave. Final Written Warning, Ex. 6 to Parniske Dep. Tr. (Dkt. 59-2).

Despite this, Michigan Bell indicates in its motion that Parniske was never at imminent risk of termination. Def. Mot. at 16. Michigan Bell has not conceded that Parniske was constructively discharged and has not provided evidence that it would have discharged him for a reason other than FMLA leave use. Because it has not presented any evidence, Michigan Bell cannot meet its burden.

As a result, Parniske's FMLA claim survives.

### b. PWDCRA Claim

While Jeup's testimony is direct evidence of FMLA retaliation, there is no direct evidence that Parniske's alleged disability — degenerative disc disease — was ever discussed by decision-makers at Michigan Bell. As a result, Parniske must satisfy the factors set forth in Ferrari. Parniske identifies his disability as degenerative disc disease, and he also notes that he has two herniated discs in his back. Parniske Dep. Tr. at 180. He stated that he has dealt with these issues since 1994. Id. at 183. Parniske testified that his back issues prevent him from standing or sitting for extended periods of time and prevents him from engaging in many recreational activities. Id. at 182. The inability to sit or stand for long periods of time is a "major life activity," as contemplated by the PWDCRA. Chiles, 606 N.W.2d at 407. There is also no evidence that this was a temporary condition. Parniske testified that he has been

suffering from degenerative disc disease since 1994, and the record does not indicate that the condition has abated since that time.  Donahoo, 282 F. Supp. 2d at 550.

There is also evidence that Parniske was otherwise qualified for the job.  Parniske stated that despite his disability, he was able to perform his job by standing intermittently while working and noted that he also "overmedicated myself to the point where I could deal with it." Id. at 184-185.  Parniske also testified that, if he were permitted to walk around for brief periods to alleviate his pain, he would be able to better perform his work.  Id. at 185.  As noted above, Parniske has suffered an adverse employment action in the form of constructive discharge.

The next factor, whether Michigan Bell knew or had reason to know of Parniske's disability, has also been established.  Parniske testified that, while management did not know the specifics of his diagnosis, they knew that he had a "back issue."  Parniske Dep. Tr. at 191.  While Parniske never formally requested any work accommodations from management, he testified that one coach manager, Jamie Proctor, provided him with a desk riser so that he could stand to alleviate back pain.  Id. at 187.  Parniske also testified to his belief that most coach managers knew of his condition from speaking with Glenn, because "she was friends and relatives with a lot of people in the building and I know they talk inside and outside of work. And one way or the other it just got up. You couldn't keep a secret, really, in an environment like that."  Id. at 190. The above demonstrates that it cannot be said that "the employer 'indisputably' had no knowledge of the disability."  Moloney v. Home Depot U.S.A., Inc., No. 11-10924, 2012 WL 1957627, at *7 (E.D. Mich. May 31, 2012) (quoting Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 932 (7th Cir. 1995)).

Finally, Parniske can satisfy the fifth factor "by showing that similarly situated non-protected employees were treated more favorably."  Jones, 488 F.3d at 404.  Parniske testified

that he was subject to a much higher degree of call monitoring by Hayes than other members of his team who were not disabled.  Parniske Dep. Tr. at 196-198.

As a result, Parniske's PWDCRA claim survives.

### 3.  Kathleen Johns

#### a.  FMLA Claim

There is direct evidence in the record that Johns's challenged employment action — constructive discharge — was motivated "at least in part" by her use of FMLA leave. Daugherty, 544 F.3d at 707.  "Discriminatory remarks by decision makers and those who significantly influence the decision-making process can constitute direct evidence of discrimination," Sharp, 726 F.3d at 798, provided that the comments do not "only lead to a conclusion of discrimination after numerous inferences and assumptions are made."  DeMasellis, 506 F. App'x at 436.  Jeup testified that Johns worked under her for a short time and that she specifically remembered Johns's name being brought up at meetings led by Leiker and Lee as someone to target for FMLA use.  Jeup Dep. Tr. at 23.  As general managers of the Port Huron call center, Leiker and Lee assuredly influenced the decision-making process of the center sales managers and coach managers.  Indeed, Johns testified to her belief that Howard, one of her coach managers, was under pressure to target her.  Johns Dep. Tr. at 233.[5]  Because Jeup's testimony is direct evidence of discrimination, Johns "does not bear the burden of disproving other possible nonretaliatory reasons for the adverse action.  Rather, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive."  Weigel, 302 F.3d at 382.

Before the burden can shift to Michigan Bell, Johns must demonstrate that she was constructively discharged.  Johns must first establish that she was subject to intolerable working

---

[5] Michigan Bell does not appear to challenge that Leiker and Lee were decision-makers.

21

conditions.  <u>Saroli</u>, 405 F.3d at 451.  Like with Armstrong and Parniske, Johns was not demoted, did not have her salary or job responsibilities reduced, and was not reassigned to menial work or to work under a supervisor.  In regard to badgering and harassment, Johns noticed a change in her work environment when Cheryl Keeling, a center sales manager, arrived at the call center in 2010.  Johns Dep. Tr. at 167.  Johns testified that around this time, people around the office began to refer to her and others who took leave as "FMLAers."  <u>Id.</u> at 192.  This is corroborated by Turner, who testified that in 2010, she was ordered by Keeling to target frequent FMLA leave users by scrutinizing their work in order to find things that they were doing incorrectly.  Turner Dep. Tr. at 11.  The idea was to place the employee in disciplinary proceedings that would eventually lead to termination or resignation.  <u>Id.</u>  Jeup testified that if an individual could not be targeted for poor scorecard numbers, she would be scrutinized for failing to adhere to less significant requirements, such as failing to read legal disclosures verbatim or taking too long at lunch.  Jeup Dep. Tr. at 12.

The treatment of Johns demonstrates how this policy was implemented.  Johns testified that she was never disciplined for her scorecard and, prior to the arrival of Keeling, she was generally someone coach managers would want on their team because she had good numbers.  Johns Dep. Tr. at 81, 338.  Johns was instead disciplined in other ways.  For instance, Johns received a suspension when she left her line open while away from her desk on May 22, 2012.  <u>Id.</u> at 107.  The day prior, while out on FMLA leave, Johns received a call from a coworker telling her that Lee had just held a meeting in which he stated that the call center would close if more people did not come into work.  <u>Id.</u>  The coworker urged Johns to come in, despite her sinus infection, because of Lee's statements.  <u>Id.</u>  During a break the next day, Johns left her desk, despite the fact that her phone line was still open and receiving calls from customers.  <u>Id.</u> at

108.   After returning to her desk and answering the calls, she was immediately confronted by Turner and Tracy Glenn, the attendance manager for the call center.  Id. at 109.   Johns was subsequently given a suspension pending termination.  Id.  This was later grieved by Johns's union and Johns was placed on a "back to work agreement," which allowed her to continue her employment.  Id.  Several months later, Johns was given a final written warning for failing to properly authenticate a caller's identity.  Id. at 113.

Johns was also subject to remarks by Howard and others alluding to her use of FMLA leave.  Howard would often tell Johns that "if you could be here more . . . you could be making your numbers."  Id. at 173.  Ashford-Porter also told Johns that, "if it's between my job and your job, it's going to be your job because . . . you got to be here."  Id. at 177.  Johns testified regarding the attendance signs around the office, as well as Turner's email regarding the eligibility of FMLA leave users to win office-wide contests.  Id. at 88, 234.  E-mails provided by Johns show that Lee went as far as to conduct surveillance on Johns outside of work to see if she was abusing her FMLA leave.  Surveillance Emails, Ex. 27 to Pl. Resp. (Dkt. 60-28).  All of the above demonstrates a pattern of harassment and badgering sufficient to establish the existence of objectively intolerable working conditions.

Johns must also show that Michigan Bell intended for her to resign. "Intent can be shown by demonstrating that quitting was a foreseeable consequence of the employer's actions." Festerman, 611 F. App'x at 321-322.  As Jeup's testimony demonstrates, forcing Johns to quit was Michigan Bell's goal.  The evidence suggests that, because Johns had good scorecard numbers, she was targeted through other disciplinary measures in an effort to remove her from the company.  Like Armstrong and Parniske, she was also subject to comments regarding her

FMLA leave use from her superiors and peers alike.  Johns has presented sufficient evidence for a reasonable jury to conclude that she was constructively discharged.

The burden then shifts to Michigan Bell to "prove by preponderance of the evidence that it would have made the same decision absent the impermissible motive."  Weigel, 302 F.3d at 382.  Michigan Bell asserts that Johns's departure was caused by multiple unprotected absences, as well as her failure to close her line when away from her desk and failure to authenticate a customer's identity.  Michigan Bell asserts that the last two instances were grounds for dismissal, yet it gave Johns second chances.  However, as noted above, Jeup's testimony indicates that these disciplinary actions were usually undertaken in order to remove FMLA leave users from the company.  Although Michigan Bell claims that it spared Johns her job when she was suspended, it indicates in its brief that Johns's punishment was reduced after her union filed a grievance.  Def. Br. at 18.  Given the evidence regarding how Johns was specifically targeted, and how this targeting was carried out, there is at least a genuine dispute of material fact regarding why Johns was moved out of the company.

As a result, Johns's FMLA claim survives.

### b.  PWDCRA Claim

Like Parniske, Johns's direct evidence of FMLA retaliation does not serve as direct evidence of disability.  There is no evidence in the record that decision-makers at Michigan Bell explicitly stated that they wanted her removed from the company because of a disability.  All evidence of targeting Johns pertained solely to her use of FMLA leave.  As a result, Johns must demonstrate a violation of the PWDCRA using the indirect method.

Johns has identified chronic sinusitis as her disability.  Johns Dep. Tr. at 153.  She testified that she suffered from swelling and it affected her ability to speak and hear.  Id. at 141-

142.   The court in <u>Chiles</u> specifically identified speaking as a major life activity under the PWDCRA.   <u>Chiles</u>, 606 N.W.2d at 407.   Unfortunately for Johns, speaking and hearing encompassed the entirety of her job responsibilities at the call center.   The PWDCRA explicitly states that the employee's disability must be unrelated to the job.   Mich. Comp. Laws § 37.1201. Johns's testimony indicates that accommodations made by Michigan Bell were often futile. Johns testified that "they would try to keep me off the lines at one point in time to accommodate me having no voice, but it became an issue that if someone with more seniority was online, you had to stay on the line whether I had a voice or not."   Johns Dep. Tr. at 157.

Furthermore, it cannot be said that Johns's chronic sinusitis substantially limited her major life activities.   "[A] disability normally does not include temporary medical conditions, even if those conditions require extended leaves from work."   <u>Donahoo</u>, 282 F. Supp. 2d at 550. While Johns has suffered from bouts of sinusitis since 2000, her testimony indicates that this was not a permanent issue.   Johns Dep. Tr. at 154-155.   There also is no evidence in the record that Johns's chronic sinusitis was perceived as being unrelated to her qualifications or ability to perform the job.   <u>Schmidli</u>, 784 F. Supp. 2d at 805.

As a result, Johns's PWDCRA claim fails.

### 4.  Cathy Lynn Nofs

### a.  FMLA Claim

There is no direct statement from Leiker, Lee, or other management that Nofs was to be targeted for her use of FMLA leave.   While Jeup testified that Nofs's name was mentioned in meetings, she did not say whether she was to be targeted like Parniske and Johns.   Jeup Dep. Tr. at 24.   Therefore, Nofs's claim is better analyzed under the <u>McDonnell Douglas</u> framework. Nofs must demonstrate that she engaged in conduct protected by the act, Michigan Bell was

aware that she engaged in this conduct, Michigan Bell took an adverse employment action against her, and there was a causal connection between the protected conduct and the adverse employment action.  Saroli, 405 F.3d at 451.

Nofs began using FMLA leave in 2010 and continued taking it intermittently through her departure in 2013.  Nofs Dep. Tr. at 123.  Further, Jeup's testimony demonstrates that Howard, Nofs's coach manager beginning in September 2012, was aware of Nofs's FMLA leave use and was worried about it.  Jeup Dep. Tr. at 24.  In regard to Nofs, Jeup testified that she "reported to Linda Howard, and I knew Linda was struggling with it.  So I know she was one that Linda was concerned about."  Id.  When asked out she knew that, Jeup testified, "because it was brought up in the meetings, and Linda and I had kind of talked on the way out."  Id. at 25.

In regard to the adverse employment action, Nofs is claiming that she was constructively discharged.  In order to prove she was constructively discharged, Nofs must establish that she was subject to intolerable working conditions and these conditions were imposed with the intention to force Nofs to resign.  Saroli, 405 F.3d at 451.  Regarding intolerable working conditions, Nofs cannot establish that she was demoted, suffered a reduction in pay or job responsibilities, or that she was reassigned to conduct menial work or to work under a supervisor.  However, Nofs testified that she began experiencing harassment because of FMLA use starting in 2010.  Nofs Dep. Tr. at 150.  During that year, Lee held a meeting with the call center's representatives in which he stated "you need to come to work.  You need to get your asses in a seat.  And if you don't, our office is going to close."  Nofs Dep. Tr. at 185.  Lee also told the employees that they needed to target the people who do not come to work.  Id.

Around the same time, Nofs began working under Myna Reynolds, a coach manager at the call center.  Nofs testified that Reynolds moved her workstation right next to Reynolds's, and

Reynolds would consistently yell over the partition while Nofs was on the phone with customers. Id. at 159.  While this may have simply been coaching, the same cannot be said for Howard. Nofs testified that when she was assigned to work for Howard in September 2012, her working conditions deteriorated rapidly.  Nofs testified that "from the time that I got her, I think it was in September . . . she just was constantly calling me up for . . . meetings.  She was coming to my desk to plug in with me.  It was just constant harassment with her in one way, shape, or form." Id. at 126.

One particular instance demonstrates the degree to which Howard targeted FMLA leave users.  Nofs testified that Howard "was on a rant one day" and asked "does anybody come to work on my team anymore?  Are they all on FMLA?"  Id. at 52.  Ann Kapus, Nofs's coworker, corroborated Nofs's testimony regarding Howard.  Kapus testified that she observed Howard "hovering over Cathy Nofs, a co-worker who used intermittent FMLA, haranguing her that she was bringing the team down, her numbers were hurting the team.  The harassment was so severe that it reduced Ms. Nofs, a longtime worker at Michigan Bell, to tears."  Kapus Decl. at 4-5, Ex. 17 to Pl. Resp. (Dkt. 60-18).

This treatment by Howard was designed to move Nofs out of the business.  Both Parniske and Johns testified that Howard expressed the pressure she was under from higher level management in light of the absences at the call center.  Parniske Dep. Tr. at 63; Johns Dep. Tr. at 233.  Jeup testified that Nofs's name was brought up at the management meetings and that Howard stated her concern over Nofs's FMLA use.  Jeup Dep. Tr. at 23-24.  It seems clear that Howard's treatment of Nofs was designed to move her out of the business so that her team's numbers would not suffer.  This evidence demonstrates both that Nofs was constructively discharged and that the discharge was sought because of Nofs's FMLA leave use.

Because Nofs has made out a prima facie case of FMLA retaliation, the burden shifts to Michigan Bell to articulate a legitimate, nondiscriminatory reason for Nofs's departure from the company. Edgar, 443 F.3d at 508. Michigan Bell has not conceded that Nofs was constructively discharged and has not set forth any potential nondiscriminatory reasons as to why Nofs was discharged. Because Michigan Bell has not articulated a reason for Nofs's departure, it has failed to meet its burden.

Nofs's FMLA claim survives summary judgment.

### b. PWDCRA Claim

While Nofs's FMLA claim survives summary judgment, the same cannot be said for her PWDCRA claim. Because her evidence of discrimination is circumstantial, Nofs must first establish a prima facie case of disability discrimination. Ferrari, 826 F.3d at 891. Nofs is unable to establish that she was disabled as defined in the PWDCRA. In her deposition, Nofs stated her belief that she is not disabled and was not disabled during the relevant time period. Nofs Dep. Tr. at 132, 170. She testified that she took FMLA leave to deal with a depressive disorder and generalized anxiety disorder. Id. at 119. Nofs has not alleged that these disorders substantially limited a major life activity "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." Chiles, 606 N.W.2d at 407. While depression can affect the ability of an individual to care for herself, Allen v. BellSouth Telecomms., Inc., 483 F. App'x 197, 200 (6th Cir. 2012), there is nothing in the record that indicates that Nofs had this problem. Nofs's testimony also indicates that her depression and anxiety were alleviated when she was away from the workplace. Nofs Dep. Tr. at 119. Furthermore, there is no indication that other individuals in the call center regarded Nofs as unable to care for herself or perform other major life activities.

28

Because Nofs cannot establish that she suffered from a disability or was regarded as having one, her PWDCRA claim fails.

### 5. Kimberly Leslie

#### a. FMLA Claim

Leslie has not presented direct evidence that she was retaliated against for taking FMLA leave.  As a result, her claim must be analyzed within the McDonnell Douglas framework. Leslie testified that she began using FMLA leave beginning in 2009 and continued to take leave until her departure in 2013.  Leslie Dep. Tr. at 108-144.  While Leslie testified that she was not aware of who was able to see her medical certifications for her FMLA leave, she would often discuss her illnesses around the office.  Id. at 236-237.  It must then be determined whether Leslie was subject to an adverse employment action and whether there was a causal connection between the adverse employment action and Leslie's FMLA leave use.  Saroli, 405 F.3d at 451.

Regarding the claimed adverse employment action, Leslie is claiming that she was constructively discharged by Michigan Bell.  There is no evidence that Leslie was demoted, suffered a reduction in salary or job responsibilities, or reassigned to menial work or to work under a supervisor.  Leslie has presented evidence that, like other FMLA users in the office, she was subject to badgering that was calculated to encourage her resignation.

Leslie's testimony demonstrates how FMLA leave users were subject to extra scrutiny. In 2009, prior to when Leslie began to take leave, she was called into a meeting led by Leiker. Leslie Dep. Tr. at 163.  The meeting consisted solely of Leiker and representatives who were not using FMLA leave.  Id.  Leiker informed the representatives that if they continued to come to work and were "not out on FMLA, we are going to be more lenient with your scorecards."  Id.

Leiker told the representatives to take notes of what he was saying so that they could pass the message on to representatives who used FMLA leave. Id. at 164.

In 2011, after she had begun taking FMLA leave, Leslie noticed that she was being singled out by management. Leslie stated that she was among a group of 15 to 18 employees coached by Hayes from 2011 to 2012. During that time, Lee and three other employees, Lynnann Rodriguez, Michelle Taughinbaugh, and Pat Murray, took leave under the FMLA. Leslie Dep. Tr. at 171. Leslie testified that Hayes would plug into their calls at a far higher rate than the other members of the team and that she would consistently walk by their desks. Id. at 170. Leslie and the others were subject to this treatment even when they were meeting or exceeding their scorecard metrics. Id. at 172. Leslie stated that both Hayes and Curtiss, her coach manager from 2012 to 2013, would not allow her to submit her time sheets without preapproval, despite allowing non-FMLA leave users to do the same. Id. at 166-167, 193-194.

Leslie testified that she was also subject to additional scrutiny while coached by Gouin during 2012. Leslie and two others on Gouin's team, Rebekah Keeley and Jenny Buckhana, were "covered," a form of critiquing, for incidents that Leslie had never heard of, including adding promotions to customers' packages or waiving certain charges. Id. at 182. This practice of scrutinizing FMLA users is consistent with Jeup's testimony that coaches were instructed to find minor infractions committed by those who took FMLA leave. Jeup Dep. Tr. at 181.

Leslie also attended meetings in which she and other FMLA leave users were singled out by management. In 2013, Pollard held a meeting in which she told Leslie and the others in attendance that "regardless of what's happening in your life, we expect you at work. If your husband has a heart attack, you need to be at work. If your kid is missing, you need to be at work." Id. at 322. Leslie also observed the signs around the office regarding attendance and

30

received the email from Turner regarding whether FMLA leave users should be allowed to win office contests. Id. at 283-284, 324.

The badgering by coach managers, along with the statements by Leiker and Pollard, demonstrate that Michigan Bell subjected Leslie to objectively intolerable working conditions with the intent to compel her to resign because of her FMLA leave use. Festerman, 611 F. App'x at 321-322. Because Michigan Bell has not proffered a nondiscriminatory reasons for its action, its motion is denied as to her FMLA claim.

### b. PWDCRA Claim

To establish a claim under the PWDCRA using circumstantial evidence, Leslie must first establish a prima facie case of disability discrimination. Ferrari, 826 F.3d at 891. Leslie suffers from irritable bowel syndrome ("IBS") and is claiming that condition as her disability. Leslie Dep. Tr. at 233. A court in this circuit has held that "controlling one's bowels is a major life activity," which is substantially limited by IBS, and IBS qualifies as a disability within the meaning of the PWDCRA. Carrasco v. Spectrum Health Hosps., No. 1:06-CV-781, 2008 WL 351647, at *4 (W.D. Mich. Feb. 6, 2008). Furthermore, there is no evidence that IBS is related to Leslie's qualifications or ability to perform her job. Leslie also testified that she had discussed her illness in the office and her use of leave to address this issue was known. Leslie Dep. Tr. at 237. Leslie's testimony regarding additional scrutiny at the hands of her coach managers demonstrates that she was treated less favorably than similarly situated employees. Jones, 488 F.3d at 404. As noted above, Leslie had her calls listened in on more frequently than her coworkers even when she was meeting or exceeding her scorecard metrics. Leslie Dep. Tr. at 170-172. Leslie also testified that she was "covered" for minor incidents by Gouin; her coworkers without illnesses were not disciplined for the same activity. Id. at 182.

31

Because the Court has already held that there is a genuine issue of fact regarding whether Leslie was constructively discharged, her PWDCRA claim survives summary judgment.

### 6. Lori Shea

#### a. FMLA Claim

Shea began taking FMLA leave in 2011 and continued to take leave until she left the company in 2015. In regard to the management meetings in which targeting FMLA leave users was discussed, Jeup testified that "they started with the people that use it the most as the biggest concerns." Jeup Dep. Tr. at 24. When asked which names were discussed during the meetings, Jeup testified "Lori Shea is another one. I remember that she used it, but I don't remember whether she fit that category." Id. While Jeup's testimony provides evidence that Shea's name was discussed in these meetings, it is unclear whether Lee or other management-level employees specifically ordered for Shea to be targeted. As a result, Shea's claim is better analyzed under the McDonnell Douglas framework.

As noted above, Shea engaged in protected activity when she took FMLA leave from 2011 through 2015. Shea testified that she suffers from depression and anxiety and that management was aware that she took leave to deal with these conditions. Id. at 118. It must then be determined if Shea was subject to an adverse employment action. Shea is claiming that she was constructively discharged by Michigan Bell in May 2015. To demonstrate she was constructively discharged, Shea must establish that Michigan Bell subjected her to objectively intolerable working conditions with the intent to force her to quit. Saroli, 405 F.3d at 451. Shea must also establish that Michigan Bell did this because of her FMLA leave use. Id.

In regard to intolerable working conditions, Shea has not shown that she was demoted, had her pay or job responsibilities reduced, or that she was reassigned to menial work or to work

32

under a supervisor. Like the other Plaintiffs before her, Shea was subject to badgering and harassment over her use of FMLA leave. Shea testified that she first felt targeted during a 2011 meeting led by Keeling. During the meeting, Keeling stated that if the company's numbers were not met and attendance did not go up, the call center would close. Id. at 153-155. In response, one of the employees in attendance suggested that the company refrain from paying individuals who took FMLA leave so they would come to work. Id. Keeling responded by saying that those individuals needed to come into work. Id. at 156. After the meeting, the signs that kept track of each day's attendance were put up around the office. Id.

Shea also testified to two other center-wide meetings in which attendance was discussed. In one meeting, Ashford-Porter reiterated that the call center's numbers were low and that employees needed to come into work. Id. at 158. Pollard led another meeting in which, as testified to by Nofs and Leslie, she stated that employees needed to come into work even if family members were sick. Id. at 159-160. Pollard also stated that in other call centers, the majority of the representatives were 30 years old or younger and wanted to keep their jobs. Id. at 160. Shea testified that FMLA leave use was discussed in small meetings held by her coach managers. While Howard was Shea's coach manager, Howard would hold "huddles" of her representatives, in which she stated that the team's numbers were so low because she had so many FMLA leave users on her team. Id. at 245. Shea also testified that Turner made similar comments. Id. at 246.

Shea testified that she felt individually targeted for her FMLA leave use when she was reassigned to work under Latrice Ford, a coach manager, in 2014. Id. at 163. Shea stated that Ford would listen in on her calls every morning as soon as Shea came into work. Id. According to Shea, she and two other FMLA leave users, Carol Doan and Ron Emerick, were the only three

employees on Ford's team subject to this kind of scrutiny.  Id. at 251.  Although the manner in which an employer supervises an employee is insufficient to establish a constructive discharge as a matter of law, Smith, 376 F.3d at 534, the treatment of Shea must be considered in conjunction with the statements made by Keeling, Pollard, and Ashford-Porter regarding FMLA leave users and attendance in general.  Jeup's testimony also establishes that Shea's name was brought up during meetings in which management discussed targeting users of FMLA leave for termination or constructive discharge.

All of this evidence together demonstrates a genuine issue of material fact regarding whether Shea was constructively discharged for taking FMLA leave.

### b.  PWDCRA Claim

Unlike her FMLA claim, Shea's PWDCRA claim cannot withstand summary judgment.  Shea's testimony demonstrates that her depression and anxiety affect the major life activity of being able to care of herself.  Shea testified that her depression affected her ability to sleep, get out of bed, or perform household duties.  Shea Dep. Tr. at 115-116.  However, Shea cannot demonstrate that these activities were substantially limited by her depression and anxiety.  The key to the substantial limitation requirement is that the alleged disability is permanent.  Donahoo, 282 F. Supp. 2d at 550.  An alleged disability cannot be considered permanent if the individual's condition can be improved with medication.  Allen, 483 F. App'x at 200.  Shea testified that her panic attacks ceased after she resigned her employment and that medication has helped alleviate her anxiety and depression.  Shea Dep. Tr. at 235-236.  The Sixth Circuit has held that improvement of a condition after an adverse employment action should be considered in analyzing disability discrimination claims.  Allen, 483 F. App'x at 200.  Because Shea's

depression and anxiety no longer substantially limit her major life activities, she cannot establish an actual disability.

There also is no evidence that Shea was regarded by her coworkers as having a determinable physical or mental characteristic that substantially limited a major life activity. Schmidli, 784 F. Supp. 2d at 805. While comments were made regarding her FMLA use, there is no evidence that individuals in the call center regarded her as disabled. Furthermore, Shea testified to her belief that she is not disabled. Shea Dep. Tr. at 112.

As a result, Shea's PWDCRA claim fails.

**E. Claims Brought By Osgood, Pretty-Kendall, Easton, and Jefferson Fail As a Matter of Law**

In its motion for summary judgment, Michigan Bell argues that Pretty-Kendall, Easton, Jefferson, and Osgood cannot establish that they were terminated in relation to exercising protected rights under the FMLA or that they were terminated based on disability discrimination. Def. Mot. at 81-103. In their response, Osgood, Pretty-Kendall, Easton, and Jefferson argue that they "are not challenging the legitimacy of their terminations under the attendance policy." Pl. Resp. at 94. Rather, the four Plaintiffs argue that they had already been constructively discharged by the time each was terminated by Michigan Bell. The Sixth Circuit has held that "[t]o constitute a constructive discharge, the employer must deliberately create intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit and the employee must actually quit." Moore, 171 F.3d at 1080 (emphasis added); see also Ball v. Ohio Ambulance Solutions, LLC, No. 1:14 CV 355, 2015 WL 5165451, at *11 (N.D. Ohio Aug. 28, 2015) ("[S]ince the record definitively establishes that Plaintiff never resigned from her job, and since the employee must resign to establish a constructive discharge claim, Plaintiff's claim fails as a matter of law."). Because the four Plaintiffs concede that their

terminations were legitimate, and because they did not actually quit, they cannot establish an adverse employment action as required by the FMLA and the PWDCRA.

Plaintiffs cite to <u>Dayton v. Sears Roebuck & Co.</u>, No. 2:12-CV-01945-TLN, 2015 WL 224775, at *1 (E.D. Cal. Jan. 15, 2015), for the proposition that an employee can have a valid claim of constructive discharge where she has been terminated pursuant to company policy. <u>Dayton</u> is not controlling here and is distinguishable.  In that case, the plaintiff, while on medical leave, contacted her employer seven times about receiving a job accommodation upon her return but never received a response.  <u>Id.</u> at *5.  The court held that the plaintiff "presented sufficient evidence for a reasonable juror to determine that any further attempts to return to work with accommodations would be futile.  Therefore, Plaintiff's allegation of constructive discharge is a sufficient adverse action."  <u>Id.</u> at *6.  There is no evidence in the record that Osgood, Pretty-Kendall, Easton, or Jefferson were ignored by Michigan Bell in an attempt to receive an accommodation upon their return to work.

Plaintiffs also cite to the Supreme Court's ruling in <u>Green v. Brennan</u>, 136 S. Ct. 1769 (2016), for the proposition that an employee's claim for constructive discharge accrues upon the employee's giving notice of his intent to resign.  Putting aside that <u>Green</u> dealt with a statute of limitations issue, Plaintiffs have mischaracterized the Court's holding.  The Court held that "the 45-day clock for a constructive discharge begins running <u>only after the employee resigns</u>."  <u>Id.</u> at 1774 (emphasis added).  Therefore, contrary to Plaintiffs' assertion, the employee needs to actually resign from his company, rather than giving "definite notice of his intent to resign," Pl. Resp. at 97, for a claim of constructive discharge to accrue.

### F.  Termination Plaintiffs

#### 1.  Ronald Emerick

### a.  FMLA Claim

Emerick has not presented any direct evidence that he was terminated in retaliation for taking FMLA leave.  As a result, his claim will be analyzed under the <u>McDonnell Douglas</u> framework.  Michigan Bell has conceded the first three elements, namely that Emerick engaged in protected conduct under the FMLA, Michigan Bell was aware of this conduct, and that Emerick suffered an adverse employment action.  However, Michigan Bell contests the fourth element, i.e., that it terminated Emerick because of his use of FMLA leave.

In support of this argument, Michigan Bell notes the lack of temporal connection between Emerick's FMLA leave and his termination. Michigan Bell claims that the last approved FMLA leave that Emerick took was in 2012, two years prior to his termination in 2014.  Def. Mot. at 89. Prior to his termination, Emerick had called in sick several times, but had failed to submit proper medical certification in order to be protected under the FMLA.  <u>Id.</u>  However, "additional scrutiny by one's employer, temporal proximity, or both, are enough to establish the causal nexus needed to make out a prima facie case of FMLA retaliation."  <u>Greer v. Cleveland Clinic Health Sys.-E. Region</u>, 503 F. App'x 422, 429 (6th Cir. 2012). Although there is a lack of temporal proximity between his excused FMLA leave and his termination, there is evidence that Emerick, like the other FMLA leave users in the office, was subject to additional scrutiny.

Emerick testified that he was in attendance at the meetings held by Leiker and Lee in which absenteeism was discussed.  Emerick was in a 2008 meeting led by Leiker, in which Leiker introduced the existence of the scorecards by which the representatives would be scored. <u>Id.</u> at 61.  At the meeting, Leiker informed Emerick and the others of the high absenteeism rate at the Port Huron center as compared to other call centers.  <u>Id.</u>  Emerick was also in attendance for a 2010 meeting held by Lee.  During the meeting, Lee stated that "the absenteeism rate was

unacceptable" and that sales numbers were suffering because of it.  Id. at 63.  In June 2012, Emerick attended another meeting regarding attendance, this time led by Ashford-Porter.  At the meeting, Ashford-Porter told the representatives that "the office could be closing due to absenteeism."  Id. at 66.  Ashford-Porter then urged the employees at the meeting to urge their coworkers who were out sick to come to work.  Id.  On another occasion, Emerick was told directly by Jamie Proctor, a coach manager, that employees on intermittent FMLA leave would be "looked at much more closely" than individuals who were not on leave.  Id. at 167.

Emerick also provided testimony that he was treated differently than his coworkers who did not take FMLA leave.  After his return from FMLA leave for the birth of his first child in 2009, Emerick began to receive more "CRIFT" calls, meaning calls that would ask customers to fill out a survey with their level of satisfaction with their customer service.  Id. at 182.  Emerick noted that the customers were dissatisfied to begin with because, by the time they spoke with someone at the Port Huron call center, they had already spoken to multiple representatives and were attempting to cancel their services with Michigan Bell.  Id.  Emerick testified that in his team of 15, there were usually 20 CRIFT calls, eight of which would be assigned to him.  Id.  By taking more CRIFT calls, Emerick was more likely to receive lower metrics on his monthly scorecard.  Emerick testified that his yearly scorecard numbers suffered because of his FMLA leave as well.  Although his hours were prorated during months when he was on FMLA, he was informed by Curtiss and Turner that his yearly numbers were not prorated.  Id. at 41.  As a result, he received unsatisfactory yearly scorecard numbers and lost his observation rights.  Id.  This meant that he was not allowed to choose whether his coach manager observed him in person or remotely.  Emerick was also ineligible to apply for a service leader position.  Id. at 275.  This

38

would have allowed Emerick to supervise and assist other representatives while receiving additional compensation. Id. at 275-276.

Emerick also testified that he was subject to badgering by some of his coach managers, particularly Ford. In addition to observing his work on a daily basis, Ford inquired regarding the reason for Emerick's FMLA leave. Id. at 164. This treatment by Ford is consistent with Shea's testimony that Ford applied extra scrutiny to FMLA leave users. Shea Dep. Tr. at 163.

The burden then shifts to Michigan Bell to articulate a legitimate, nondiscriminatory for Emerick's termination. Michigan Bell notes that Emerick violated company policy by accruing numerous unexcused absences. From 2011 until his termination in 2014, Emerick received various documented and verbal warnings, as well as suspensions for his absenteeism. Emerick Dep. Tr. at 106-107. Virtually all of this discipline resulted from days in which Emerick called in sick but was unable to provide Michigan Bell with the proper medical certification to receive FMLA leave.

Because Michigan Bell has proffered a legitimate reason for Emerick's termination, the burden shifts back to Emerick to demonstrate that the proffered reason was pretextual. Emerick can do this by demonstrating that "the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." Dews, 231 F.3d 1016, 1021 (6th Cir. 2000).

Emerick's absenteeism had a basis in fact and was sufficient to warrant termination. Emerick had numerous unexcused absences in his last several years of employment with Michigan Bell and had worked his way through the company disciplinary process prior to his termination. It must then be determined whether Emerick's unexcused absences actually motivated his termination.

Although there is ample evidence that there was a policy to target FMLA users, and that Emerick was subject to scrutiny, the amount of unexcused absences that he incurred over the course of his employment weighs in favor of Michigan Bell.  In order to prove that Michigan's Bell's proffered reason did not actually motivate his termination, Emerick must show that "the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup."  Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1084 (6th Cir. 1994), overruled on other grounds by Gross v. FBL Fin. Servs., Inc., 557 U.S. 167 (2009).  In other words, Emerick must show that his circumstantial evidence "overwhelms" Michigan Bell's nondiscriminatory reason.  Id.

Further, he must present evidence beyond what he has offered in support of his prima facie case.  Id.  Although Emerick received more CRIFT calls and additional scrutiny from coach managers upon returning from FMLA leave, this conduct predated the excessive absenteeism that led to his termination in December 2014.  Emerick had not received FMLA leave in over two years prior to his termination.  There is no evidence, beyond what was discussed at the prima facie stage, to prove that the proffered reason, Emerick's excessive absenteeism, was a pretext. See Id. ("in order to make this type of rebuttal showing, the plaintiff may not rely simply upon his prima facie evidence but must, instead, introduce additional evidence of age discrimination.").

As a result, Emerick cannot carry his burden of showing that his unexcused absences did not actually motivate his termination.  Therefore, his FMLA claim fails.

### b.  PWDCRA Claim

Emerick also cannot demonstrate that he has a qualifying disability under the PWDCRA. "[A] disability normally does not include temporary medical conditions, even if those conditions

40

require extended leaves from work." <u>Donahoo</u>, 282 F. Supp. 2d at 550. Furthermore, evidence of recovery after leaving employment can demonstrate that the employee is not disabled. <u>Allen</u>, 483 F. App'x at 201. Emerick testified that he no longer suffers from depression and anxiety and that these conditions abated after his employment with Michigan Bell ended. Emerick Dep. Tr. at 282. Even if Emerick had presented evidence that his depression and anxiety affected a major life activity, which he has not, he has not demonstrated that these conditions are permanent. Emerick has also failed to present evidence that he was regarded as having a disability. Ford's inquiry regarding why Emerick was on leave demonstrates that other employees were unaware of his exact condition. Ford's questioning also demonstrates that she was under the impression that Emerick's leave was taken in order to care for his children.

Emerick cannot demonstrate that he was regarded as having a disability and his PWDCRA claim fails.

### 2. Heidi Pojeky

#### a. FMLA Claim

Michigan Bell first argues that Pojeky's FMLA claim is time-barred by the FMLA's statute of limitations. The FMLA states that a claim brought under the FMLA must be brought "not later than 2 years after the date of the last event constituting the alleged violation for which the action is brought." 29 U.S.C. § 2617(c)(1). However, this period is extended to three years if the violation is "willful." 29 U.S.C. § 2617(c)(2). "An employer commits a willful violation of the FMLA when it acts with knowledge that its conduct is prohibited by the FMLA or with reckless disregard of the FMLA's requirements; therefore, the determination of willfulness involves a factual question." <u>Ricco v. Potter</u>, 377 F.3d 599, 602 (6th Cir. 2004). "A plaintiff must do more than show that his employer knew [the FMLA] was in the picture, because such a

low standard would obliterate any distinction between willful and nonwillful violations." Woida v. Genesys Reg'l Med. Ctr., 4 F. Supp. 3d 880, 893 (E.D. Mich. 2014).

As has been noted, there is ample evidence that Leiker and Lee created a policy to target FMLA users by subjecting them to additional scrutiny. As will be discussed below, there is evidence that this policy was applied to Pojeky. Michigan Bell's method of moving FMLA leave users out of the business by subjecting them to additional scrutiny demonstrates knowledge that targeting FMLA users was barred by the FMLA. Because Pojeky's claim was filed on June 4, 2015, one day shy of the three year anniversary of her termination, her claim falls within the statute of limitations period for willful FMLA violations and is thus not time-barred.

Because there is no direct evidence that Pojeky was targeted because of her FMLA leave use, her claim will be analyzed under the McDonnell Douglas framework. Like with Emerick, Michigan Bell does not contest the first three elements necessary for a prima facie FMLA retaliation. Michigan Bell only argues that there is no causal connection between Pojeky's FMLA leave and her termination.

Michigan Bell's contention notwithstanding, there is sufficient evidence in the record to demonstrate a causal connection between Pojeky's use of FMLA leave and her termination on June 5, 2012. Emerick testified that she attended multiple center-wide meetings in which absenteeism and FMLA were specifically discussed. In addition to meetings held by Leiker and Lee, Emerick testified to a 2012 meeting led by Ashford-Porter. Pojeky Dep. Tr. at 62. At the meeting, both union representatives and Ashford-Porter discussed the amount of FMLA leave employees at the Port Huron center were taking. Pojeky testified that the message of the meeting was "you people just need to come to work, stop using FMLA." Id. at 64.

There is also evidence that Pojeky was criticized directly for her use of FMLA leave. From January 2012 to June 2012, Pojeky was approved for 30 hours of intermittent FMLA leave per month in order to address her depression and anxiety.  In May 2012, Pojeky met with Suzanne Dimick, her coach manager, to go over her scorecard results.  At the meeting, Dimick told Pojeky that she needed to come to work and "you need to stop using FMLA."  Id. at 100. This statement was made approximately one month before Pojeky was terminated by Michigan Bell.  Easton testified that Dimick would discuss how people on her team would abuse their FMLA leave.  Easton Dep. Tr. at 113-114.  On one occasion, Dimick had Easton call Pojeky while Pojeky was on leave to ask what was wrong with her and when she was returning to work. Id. at 114.  This evidence demonstrates a causal connection between Pojeky's use of FMLA leave and her termination.

The burden then shifts to Michigan Bell to articulate a legitimate, nondiscriminatory reason for Pojeky's termination.  Michigan Bell states that it terminated Pojeky because she accessed a relative's account in violation of the company's Code of Business Conduct ("COBC").  Michigan Bell notes that on three separate occasions, including in November 2011 and January 2012, Pojeky placed a monetary credit on her stepfather's account.  Pojeky Dep. Tr. at 141.  Michigan Bell states that, pursuant to company policy, an employee is prohibited from accessing the account of a relative without written permission from a supervisor.  Ashford-Porter called Pojeky into a meeting regarding this violation on May 7, 2012 and suspended her.  Id. at 130.  Because a violation of company policy is a legitimate, nondiscriminatory reason for termination, the burden shifts back to Pojeky to demonstrate that the proffered reason is pretextual.

43

Pojeky can demonstrate pretext by showing that "the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." Dews, 231 F.3d 1016, 1021 (6th Cir. 2000).

In regard to whether Michigan Bell's given reason for termination has a basis in fact, Pojeky states that while she did adjust her stepfather's account, she had received verbal permission from Dimick. Id. at 160. However, as Michigan Bell notes, the company requires written permission.

Despite this, there is sufficient evidence to prove that Pojeky's placing of a monetary credit on her stepfather's account did not actually motivate her termination. The comments made by Dimick to both Pojeky and Easton demonstrate that Dimick was unhappy that Pojeky's FMLA leave use was bringing down her numbers. Easton Dep. Tr. at 100, 113-114. The action of finding a violation of company policy in order to get rid of an FMLA leave user is consistent with Jeup's testimony that coach managers were ordered to find any infraction committed by those on leave in order to move them out of the business.

The timing of Pojeky's violation and termination also lends credence to the assertion that the violation did not motivate Michigan's Bell's termination of Pojeky. The last violation occurred in January 2012, approximately five months before Pojeky was terminated. During that five month period, Pojeky took FMLA leave from March 2, 2012 to April 10, 2012, and again on April 16, 2012, and April 17, 2012. Pojeky was not called in to discuss the violation of company policy until May 7, 2012. This is persuasive evidence that Pojeky's accessing of her stepfather's account did not actually motivate her termination.

Because Pojeky has carried her burden of demonstrating that the proffered reason for her termination was a pretext, her FMLA claim survives.

44

### b.  PWDCRA Claim

To establish a claim under the PWDCRA using circumstantial evidence, Pojeky must first establish she is disabled.  Ferrari, 826 F.3d at 891.  Pojeky has presented evidence that her depression and anxiety are disabilities because they substantially limit a major life activity.  Pojeky testified that her depression and anxiety often cause her to be unable to get out bed or take care of herself.  Pojeky Dep. Tr. at 110-111.  The Sixth Circuit has recognized that depression can affect the ability of an employee to take care of herself.  Allen, 483 F. App'x at 200.  There is also evidence that Pojeky's depression and anxiety are permanent.  She testified that, unlike Shea, she still suffers from both conditions today and that, if she were still employed by Michigan Bell, she would still need to take FMLA leave.  Pojeky Dep. Tr. at 235.

There is also evidence to establish the remaining factors.  Pojeky testified that her FMLA leave allowed her to perform her job when she was able to attend work.  Although Pojeky could not recall if anyone at the call center said anything to her about her depression or anxiety, Easton testified that Dimick made her call Pojeky while she was out on leave and ask "what was wrong with her."  Easton Dep. Tr. at 114.  Pojeky also testified that she told Dimick directly about her conditions.  Pojeky Dep. Tr. at 118-119.  This provides evidence that Dimick was aware of Pojeky's condition.  The final factor may be satisfied "by showing that similarly situated non-protected employees were treated more favorably."  Jones, 488 F.3d at 404.  Pojeky provided testimony that while she was ultimately fired for accessing her stepfather's account with only verbal permission, Easton and other employees were allowed to access the accounts of relatives with verbal permission without repercussions.  Pojeky Dep. Tr. at 278-279.

As a result, Pojeky's PWDCRA claim survives.

### IV. CONCLUSION

For the foregoing reasons, Michigan Bell's summary judgment motion (Dkt. 59) is granted as to the FMLA claims brought by Osgood, Pretty-Kendall, Easton, Jefferson, and Emerick.  Michigan Bell's motion is denied as to the FMLA claims brought by Armstrong, Parniske, Johns, Nofs, Leslie, Shea, and Pojeky.  Michigan Bell's motion is granted as to the PWDCRA claims brought by Armstrong, Johns, Nofs, Shea, Osgood, Pretty-Kendall, Easton, Jefferson, and Emerick.  Michigan Bell's motion is denied as to the PWDCRA claims brought by Parniske, Leslie, and Pojeky.

SO ORDERED.


Dated:  February 27, 2017               s/Mark A. Goldsmith
Detroit, Michigan                       MARK A. GOLDSMITH
                                        United States District Judge


## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 27, 2017.

                                        s/Karri Sandusky
                                        Case Manager